UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-CR-80111-ROSENBERG/REINHART

UNITED STATES OF AMERICA

vs.

ERIC SNYDER,
JOSEPH LUBOWITZ, and
CHRISTOPHER FULLER,
          Defendants.
                              /

## GOVERNMENT'S OPPOSITION TO THE
## DEFENDANTS' MOTIONS TO DISMISS COUNTS OF THE INDICTMENT, AND
## TO STRIKE PREJUDICIAL INDICTMENT SURPLUSAGE

The United States hereby respectfully submits its Consolidated Opposition to Defendants' Motions to Dismiss Counts of the Indictment [D.E. 177], and to Strike Prejudicial Indictment Surplusage. [D.E. 180].[1] Defendant LUBOWITZ filed a Motion to dismiss the Health Care Fraud Conspiracy, substantive Health Care Fraud, and Travel Act counts against him. [D.E. 177]. Since Defendants all joined the other Defendants' motions [D.E. 188, 198], the Government collectively opposes such counts as to all Defendants, and not just the substantive health care fraud and Travel Act counts pertaining to LUBOWITZ.

Defendants' Motion to Dismiss the Health Care Fraud charges as unconstitutional based on Texas v. United States should be denied. Essentially this same motion by the defense in United States v. Phillip Esformes, et al., 16-CR-20549-SCOLA [D.E. 1209] ,was recently denied by Judge

---

[1] The Government received an extension to respond to Defendant's Motion to Dismiss certain Counts in the Indictment [D.E. 177], and already responded to Defendant's Motion to Strike Prejudicial Surplusage in the Indictment when it filed its Omnibus Opposition on June 11, 2019, [D.E. 202]. The Government also includes its previously filed opposition to Defendants Motion to Strike Prejudicial Indictment Surplusage [D.E.180] in this filing for ease of reference for the Court, since these are the legal motions the Court will be dealing with that were not referred to Hon. Reinhart.

Scola, in an April 3, 2019, Order, [D.E. 1235]. Judge Scola considered all the arguments made by Defendants here, and rejected them. The Court should do the same in this case.

Similarly, other district courts (albeit not in this Circuit) have upheld Travel Act charges based on anti-kickback state bribery statutes, just like the charges in this case, which are based on Florida's (Anti) Patient Brokering Act. Fla. St. § 817.505. [See Indictment, D.E 46, at 4]. The Travel Act expressly provides for such reliance on state law bribery statutes, as here.

Finally, the language in the Indictment is hardly "prejudicial surplusage," but rather is highly relevant to Defendant's intent to violate the Travel Act, commit Health Care Fraud, and engage in Money Laundering. Any problems of prejudice can be cured with a jury instruction. Further, any Motion to dismiss any purported "prejudicial" language in the Indictment is premature since all the evidence showing its relevance has not been heard.

## BACKGROUND

On June 7, 2018, Defendant SNYDER, alongside Defendants LUBOWITZ and FULLER, were charged in a detailed 32-page Indictment detailing twenty-three criminal violations. [D.E. 46]. Defendants were charged with conspiracy to commit health care fraud and wire fraud (Count 1), substantive counts of health care fraud (Counts 2-12), and Travel Act violations (SNYDER and LUBOWITZ) (Counts 13-15). Defendants were also charged with conspiracy to commit money laundering, and substantive counts of money laundering.

Rather than repeat the facts of the case that the Government believes the evidence will show at trial, the Government relies on and incorporates the Factual Background contained in its Omnibus Motion in Limine. [D.E. 189, at 2-6]. Defendants were charged in a substance abuse addiction treatment scheme centered at SNYDER's sober home, Halfway There Florida, LLC, and addiction treatment center, Real Life Recovery Delray, LLC (collectively HWT/RLR). This scheme, orchestrated by SNYDER, involved vulnerable drug and alcohol addicted patients,

procured through kickbacks, who were used to defraud private health care benefit programs. SNYDER and his co-conspirators fraudulently billed patients' private insurers (Insurance Plans) for medically unnecessary urinalysis tests (UAs), and therapy sessions that were never provided. Patients were enticed into the scheme through kickbacks and bribes in the form of free or reduced rent, airline tickets, and other benefits, and brought to HWT/RLR through kickbacks and bribes paid to patient recruiters like LUBOWITZ and FULLER. Defendants laundered the proceeds to conceal their ill-gotten gains and kickback payments. The private Insurance Plans in this case were billed for more than $58 million and paid more than $20 million during the conspiracy.

## ARGUMENT

### I. DEFENDANT'S MOTION TO DISMISS THE HEALTH CARE FRAUD CHARGES AS UNCONSTITUIONAL SHOULD BE DENIED.

The United States hereby respectfully opposes Defendants Motion to Dismiss based on Texas v. United States, 340 F. Supp. 3d 579 (N.D. Tex. Dec. 14, 2019), pending appeal, 5th Cir. No. 19-10011. Defendants' motion should be denied in its entirety.

As an initial matter, Defendant's motion lacks merit as neither the district court's decision in Texas v. United States, nor the Government's decision to defend that decision before the United States Court of Appeals for the Fifth Circuit, affects this criminal prosecution. That is because the Indictment charges the Defendant with violations of law occurring prior to January 1, 2019, the effective date of the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054, which eliminated the tax penalty for failing to comply with the "individual mandate" within the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119. Finally, even assuming the invalidation of the ACA applies retroactively to events prior to January 1, 2019, the criminal statutes amended by the ACA that Defendant is charged with violating, 18 U.S.C. § 1347, was in force long before the ACA was passed, and the amendments to those statutes made by that law have no effect on the continued viability of Defendant's prosecution.

3

**A. The Patient Protection and Affordable Care Act Litigation.**

On March 23, 2010, President Barack Obama signed the ACA into law. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010). As the Supreme Court explained, one of the "key provisions" of the ACA was the "individual mandate," which required most Americans to maintain "minimum essential" health insurance coverage for themselves and their dependents or pay a tax penalty. Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB), 567 U.S. 519, 539 (2012). In NFIB, the Supreme Court determined that the individual mandate was a valid exercise of Congress's taxation power. Id. at 574. In 2017, however, Congress eliminated the tax penalty for failing to comply with the individual mandate, effective January 1, 2019. See Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054. In December 2018, the United States District Court for the Northern District of Texas held in a civil case that the ACA's individual mandate is unconstitutional in light of that change. See Texas, 340 F. Supp. 3d at 605. The district court has also ruled that, because Congress intended the health insurance provisions of the ACA to work together, the individual mandate provision is "inseverable from the entire ACA," rendering the entire ACA invalid. Texas, 340 F. Supp. 3d at 613-15 (capitalization altered).[2]

On January 3, 2019, the Intervenor-Defendants in Texas v. United States, various state intervenors appealed the district court's order to the Fifth Circuit.[3] The following day, the United States of America, the U.S. Department of Health & Human Services, Alex Azar, in his official capacity as Secretary of HHS, the U.S. Internal Revenue Service, and Charles P. Rettig, in his

---

[2] On December 30, 2019, the district court stayed enforcement of its order throughout the pendency of appellate proceedings. See Texas v. United States, 352 F. Supp. 3d 665, 689 (N.D. Tex. 2018).

[3] These state intervenors are the: District of Columbia; State of California; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; Commonwealth of Kentucky; Commonwealth of Massachusetts; State of Minnesota; State of New Jersey; State of New York; State of North Carolina; State of Oregon; State of Rhode Island; State of Vermont; Commonwealth of Virginia; and State of Washington.

4

official capacity as Commissioner of the Internal Revenue Service (collectively referred to as the "Federal Defendants" in the district court proceeding) filed a separate notice of appeal. On March 25, 2019, the Civil Division of the United States Department of Justice stated in a letter to the Fifth Circuit: "The Department of Justice has determined that the district court's judgment should be affirmed. Because the United States is not urging that any portion of the district court's judgment be reversed, the government intends to file a brief on the appellees' schedule."

Essentially, Defendants argue that in light of the Department of Justice's representation to the Fifth Circuit that the district court's decision should be affirmed, and that the United States would not argue that any portion of the decision should be reversed, the Due Process Clause does not permit the Justice Department to prosecute the Defendant based upon alleged violations of statutes and regulations that they have independently deemed and declared to be unconstitutional. But the purported unconstitutionality of the ACA does not affect 18 U.S.C. § 1347 (the Health Care Fraud statute) because it was on the books long before the enactment of the ACA, and, even more importantly, Texas v. United States does not affect any Health Care Fraud charges for conduct that took place before January 1, 2019.[4]

**B. The Invalidation of the ACA Is Inapplicable to this Case Because Defendants Criminal Conduct Occurred Prior to January 1, 2019.**

As it represented to the Fifth Circuit, the Department of Justice will defend the district court's decision in Texas v. United States. However, that does not entitle Defendants to the relief they seek. This is because it is Government's position is that the ACA was rendered invalid *as of January 1, 2019*, when Congress zeroed out the tax penalty for individuals who fail to comply with the statute's individual mandate and thus eliminated the only constitutional basis for the individual mandate. Up until that date, however, there is no dispute that the entirety of the ACA

---

[4] This applies as well to any charged violations to conspire to violate the Health Care Fraud statute under 18 U.S.C. § 1349, and any Indictment that references 18 U.S.C. § 24(b), as here.

was a valid exercise of Congress's tax power under the Supreme Court's decision in NFIB.  Thus, the decision of the United States to defend the district court's decision in Texas has no effect on criminal prosecutions for conduct that occurred before January 1, 2019,[5] including the charges against the Defendants in this case for Health Care Fraud, and Conspiracy to Commit Health Care Fraud and Wire Fraud.  The Conspiracy period in the Indictment in Count 1 is from in and around January 2011 through September 2015; the substantive Health Care Fraud charges in Counts 2-12 range from June 13, 2013, through July 14, 2014. [D.E. 46 at 12, 18-19].

The district court's decision in Texas, upon which Defendants rely, was based on Congress's enactment of the Tax Cuts and Jobs Act of 2017, which eliminated the tax penalty for failing to comply with the individual mandate.  Congress's decision to eliminate the tax penalty, particularly given that it did so following the Supreme Court's widely-publicized decision in NFIB that the ACA was constitutional under Congress's taxing authority, is tantamount to a legislative "amendment" of the ACA.  And even though Congress did not specifically legislatively repeal the ACA, the purpose behind the passage of the federal saving statute compels its application here.  As the Fifth Circuit noted, the general language employed in the saving statute "provides evidence of a strong congressional antipathy towards what might be called (for want of a better term)

---

[5] This conclusion logically flows from Congress's enactment of the federal saving statute, 1 U.S.C. § 109, which provides that "[t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute."  At common law, the general principle was "that a court was to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Bradley v. Sch. Bd. of City of Richmond, 416 U.S. 696, 711, (1974).  However, in 1871 Congress enacted the federal saving statute in an effort "to abolish this common-law presumption that the repeal of a criminal statute resulted in the abatement of all prosecutions which had not reached final disposition in the highest court authorized to review them." Warden, Lewisburg Penitentiary v. Marrero, 417 U.S. 653, 660 (1974) (defendant convicted before statutory change broadening parole eligibility remained ineligible for parole) (internal quotation marks and citation omitted).  Since the enactment of the federal saving statute, courts have held that it applies not only when a statute is repealed, but also when it is legislatively amended, see Martin v. United States, 989 F.2d 271, 274 (8th Cir. 1993), or expires pursuant to a sunset provision, see United States v. Mullins, 356 F. Supp. 2d 617, 619-620 (W.D. Va. 2005) (defendant may be convicted under the assault weapons ban after it expired because his conduct was illegal at the time).

amnesty by expiration or inadvertent repeal." United States v. Uni Oil, Inc., 710 F.2d 1078, 1083 n.3 (5th Cir. 1983); see also United States v. Smith, 433 F.2d 341, 342 (4th Cir. 1970) (purpose of section was to allow prosecutions to continue for "previously incurred criminal liability.").[6]

Put simply, given the history of, and purpose behind, the enactment of the federal saving statute, it is clear that neither the district court's decision in Texas, nor the Government's recently-announced determination to defend that ruling on appeal, provides any basis to dismiss the charges against Defendants. The invalidation of the ACA by the district court in Texas has no effect on criminal prosecutions for conduct that occurred before January 1, 2019, the effective date of the statute eliminating the constitutional basis for the individual mandate. Because all of the conduct charged in the Indictment occurred prior to that date, Defendants' motion should be denied.

**C. Defendant Remains Subject to Conviction Under the Health Care Fraud Statutes as Written Prior to the ACA's Enactment.**

Even if the district court's decision in Texas holding the individual mandate unconstitutional and unseverable from the rest of the ACA could be deemed to retroactively apply to Defendants criminal conduct prior to the repeal of the ACA's tax penalty (and it cannot), Defendants would still not be entitled to either dismissal of the charges. That is because their entire motion proceeds from a faulty premise that the health care offenses charged are unconstitutional. [D.E. 177 at 5]. That is incorrect as matter of law. Texas held that a portion of the ACA was unconstitutional and, because that portion of the law was not severable from the remainder, the entire law was unenforceable. But a legal determination that the ACA is no longer

---

[6] Neither United States v. Chambers, 291 U.S. 217 (1934), nor Hamm v. City of Rock Hill, 379 U.S. 306 (1964), compels a different conclusion here. While in both cases the Supreme Court determined that prosecutions for conduct that occurred before a change in law could not continue once the change occurred, notwithstanding the federal saving statute, each presented specific facts not present here—namely a constitutional amendment or federal legislation conferring new affirmative rights on individuals and specifically condoning conduct that had previously been criminal.

enforceable is fully distinct from a conclusion that every already-existing statute referenced within the ACA is unconstitutional. The ACA did not enact the health care fraud offenses charged in the Indictment; indeed, both had been on the books for years before the ACA was enacted. The health care fraud statute, 18 U.S.C. § 1347, was first enacted in 1996 as part of the Health Insurance Portability and Accountability Act, Pub. Law No.104–191, 110 Stat. 1936 (August 21, 1996).

The fact that the health care fraud statute was lawfully enacted prior to the passage of the ACA, and is thus not subject to constitutional challenge, is fatal to Defendants' argument under Supreme Court precedent almost a century old. In Frost v. Corporation Commission, 278 U.S. 515, 526-27 (1929), the Supreme Court considered what effect a legislative amendment deemed unconstitutional had on the continued viability of the original statute. The Court held:

> Here it is conceded that the statute, before the amendment, was entirely valid. When passed, it expressed the will of the Legislature which enacted it. Without an express repeal, a different Legislature undertook to create an exception, but, since that body sought to express its will by an amendment which, being unconstitutional, is a nullity and, therefore, powerless to work any change in the existing statute, that statute must stand as the only valid expression of the legislative intent.

Id.; see also Truax v. Corrigan, 257 U.S. 312, 342 (1921) ("The exception introduced by amendment to paragraph 1456 proving invalid, the original law stands without the amendatory exception.") [7]

Accordingly, under the Supreme Court's holdings in Frost and Truax, the only provisions that could have been rendered invalid by the decision in Texas are the amendments to 18 U.S.C. § 1347; the statute as it existed prior to the ACA's enactment remain enforceable. "If the original act is constitutional, and no serious claim is made that it is not, its validity could not be impaired by the subsequent adoption of what was in form an amendment—even though in legal effect a

---

[7] See also, United States v. Silverman, 129 F. Supp. 496, 507 (D. Conn. 1955) (applying this doctrine in a criminal case and concluding that "the invalidity of [a statutory] amendment on constitutional grounds would make the amendment a nullity and would leave the validity of the Smith Act, as it stood on [on the date of the indictment], unimpaired").

8

nullity." Shore v. Cross, 7 F. Supp. 70, 75 (D. Conn. 1934) (citing Eberle v. Michigan, 232 U.S. 700, 704 (1914)). And, as explained below, none of the ACA amendments undermine the Health Care Fraud charges against Defendants.[8]

First, the ACA added new mens rea provisions to the health care fraud statute that clarified that the requirement in both statutes that the defendant act "willfully" did not require the Government to prove that the defendant knew of the existence of, or intended to violate, those specific statutes. See 18 U.S.C. § 1347(b) ("With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."). The remainder of the statute, including the description of the elements of the offense were unchanged by the ACA.[9]

This amended mens rea language is of no moment. The mens rea language the ACA added to the health care fraud statute merely codified already existing Eleventh Circuit precedent that the Government need not prove that the defendant knew he was violating a specific statute to secure a conviction under either statute, see Bryan v. United States, 524 U.S. 184, 193 (1998) (to prove a violation of a statute employing the word "willfully" the jury "must find that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was

---

[8] As explained, the elimination of the ACA's tax penalty has rendered the individual mandate unconstitutional. Insofar as the ACA has been deemed not severable, the invalidation of part of the statute means that other provisions of the Act—including the amendments to the health care fraud and Anti-Kickback statutes—are unenforceable on a prospective basis. But that fact does not call into question the *constitutionality* of the criminal provisions. It is well established that Congress's initial enactment of 18 U.S.C. § 1347 and 42 U.S.C. § 1320a-7b was a valid exercise of its authority under the commerce clause. See, e.g., United States v. Ogba, 526 F.3d 214, 239 (5th Cir. 2008) ("Congress had the power to enact the Health Care Fraud and Illegal Remuneration statutes under the Commerce Clause of the Constitution, and offenses charged under these statutes do not fall outside of Congress's constitutionally-granted powers."). The amendments to these criminal statutes contained within the ACA are likewise constitutional under the commerce clause.

[9] Since the 18 U.S.C. § 1349 Conspiracy charged in the Indictment accuses Defendants of conspiring to commit the underlying crimes of Health Care Fraud under Section 1347, and Wire Fraud under 1343, what matters here is how ACA and Texas affect Section 1347, and not Section 1349.

9

unlawful" except for "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct" which require that the defendant have knowledge of the law being violated); United States v. Starks, 157 F.3d 833, 838-39 & n.8 (11th Cir. 1998) (applying the willfulness standard from Bryan to 42 U.S.C. § 1320a-7b). Contra Hanlester Network v. Shalala, 51 F.3d 1390, 1400 (9th Cir. 1995) (holding that proof of specific intent was required to violate 42 U.S.C. § 1320a-7b(b)(2)).[10]

Second, the ACA redefined the term "federal health care offense" set forth in 18 U.S.C. § 24 to include violations of the Anti-Kickback Statute. See 18 U.S.C. § 24(a)[11] ("As used in this title, the term 'Federal health care offense' means a violation of, or a criminal conspiracy to violate—(1) section 669, 1035, 1347, or 1518 of this title or section 1128B of the Social Security Act (42 U.S.C. 1320a-7b)). This change made violations of the Anti-Kickback Statute a specified unlawful activity under the money laundering statute. See 18 U.S.C. § 1956(c)(7)(F) (defining specified unlawful activity as, inter alia, "any act or activity constituting an offense involving a Federal health care offense"). Violation of the federal Anti-Kickbacks statute, however, is not charged in this case, and will not be a subject of the money laundering counts as an SUA since this case involved private insurers. Florida State law against kickbacks, bribes, and patient brokering, which is important to the Travel Act counts (see below), is a subject of the Indictment.

---

[10] For similar reasons, any vagueness challenge will lack merit. The fact that the United States now agrees that the ACA is invalid does not in any way suggest that regulations that were lawful, and in force before January 1, 2019, were standard-less, or failed to give Defendants (or anyone else) fair warning that their conduct was unlawful.

[11] The ACA also led to the promulgation of a variety of regulations and policies. Much like the ACA's enactment of the statutory amendments to the Health Care Fraud and Anti-Kickback Statute, there is no question that the issuance of these regulations and policies was lawful under the ACA at the time they were promulgated and throughout Defendant's unlawful scheme as alleged in the Indictment. And although the jury may consider evidence of such regulations to evaluate Defendants' knowledge, state of mind, or whether they acted with criminal intent, whether or not they became invalid years after the conduct alleged in the Indictment says nothing about their knowledge or intent at the time he acted.

Thus, as explained above, even though the Government's position is that the invalidation of the ACA has no application here when the charged conduct predated the repeal of the individual mandate's tax penalty, even if that were not the case, none of the amendments the ACA made to the statutes at issue in this prosecution undermine the Health Care Fraud charges against the Defendants currently under consideration by the jury.[12]  For the foregoing reasons, the United States respectfully requests that Defendants Motion to Dismiss the Health Care Fraud offenses in the Indictment be summarily denied.

---

[12] In addition to the changes noted above, certain provisions of the ACA may affect the sentences of individuals convicted of federal health care fraud offenses.  For one, the ACA required the United States Sentencing Commission to amend the United States Sentencing Guidelines to include certain enhancements for health care fraud offense that are now set forth in U.S.S.G. § 2B1.1.  *See* U.S.S.G. § 2B1.1(b)(7) (providing for a 2, 3, or 4-level increase to the base offense level for a defendant was "convicted of a Federal health care offense involving a Government health care program" when the loss to the Government health care program was more than $1,000,000, $7,000,000, or $20,000,000, respectively).  In addition, the ACA's amendment to the definition of "federal health care offense" in 18 U.S.C. § 24 also rendered the proceeds of violations of the Anti-Kickback Statute subject to criminal forfeiture.  See 18 U.S.C. § 982(a)(7) ("The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.").  Although the Government's primary contention is that the invalidation of the ACA does not apply retroactively to the Defendant because he is charged with conduct that predated January 1, 2019, *see* Part II, *supra*, this Court need not consider the implication of the ACA's changes relevant to sentencing now, but can wait to address that issue at sentencing, if Defendants are convicted of any of the health care offenses charged in the Indictment.

## II. THE TRAVEL ACT COUNTS IN THE INDICTMENT PROPERLY STATE A CRIME AND SHOULD NOT BE DISMISSED.

Defendants move to dismiss the Travel Act charges (Counts 13-15) for failure to state an offense. This argument is meritless, and expressly precluded by the clear terms of the statute itself.

The Travel Act, 18 U.S.C. § 1952(1) and (3),[13] makes it a crime to use the U.S. mail and interstate or foreign travel for the purpose of engaging in certain specified criminal acts (defined as "unlawful activity"). These specified criminal acts of "unlawful activity" include bribery in violation of the laws of the state in which the acts are committed. The term "unlawful activity" includes extortion and bribery, as defined by state law. Id. § 1952(b)(2).[14] Defendants' Motion elides over this fact, concentrating only on the first group of enumerated offenses consisting of unlawful activity in his Motion in Section 1952(b)(1), ignoring the prohibition against bribery in (b)(2). [D.E. 177, at 5]. But the Travel Act expressly allows, on its face, the charges in the Indictment at Counts 13-15.

---

[13] The Travel Act, 18 U.S.C. § 1952, provides that:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
> (1) distribute the proceeds of any unlawful activity; or
> (2) commit any crime of violence to further any unlawful activity; or
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity.

The term "unlawful activity" includes extortion and bribery, as defined by state law. "As used in this section (i) "unlawful activity" means . . .  (2) extortion, **bribery**, or arson in violation of the laws of the State in which committed or of the United[.]" Id. § 1952(b)(2).

[14] The term "bribery" as used in the Travel Act is broadly defined. See United States v. Perrin, 580 F.3d 730 (5th Cir. 1978), aff'd, Perrin v. United States, 100 S. Ct. 311 (1979) (Congress, in enacting Travel Act, which specifically outlaws extortion, bribery or arson in violation of state laws, intended "bribery" to be used in its generic sense and not to be limited to its common law meaning, and thus violation under this section could be based on commercial bribery in violation of State Commercial Bribery Statute); United States v. Pomponio 511 F.3d 953, 956 (4th Cir. 1975) ( The word "bribery" as used in the Travel Act is not limited to the corruption of public officials, but extends to conduct involving private individuals, and applied to defendant's conduct in making payments to bank officer to influence his conduct relative to loans made to corporations owned or controlled by defendants).

In this case, the Government charges hinge on violations of the Florida statute outlawing Patient Brokering, the Florida Patient Brokering Act, which specifically prohibits kickbacks and "bribes." See Fla. Stat. § 817.505 [cited in Indictment, D.E. 46 at 4, ¶ 9]. There is no question that the Florida Patient Brokering statute outlaws bribery in the context of patient recruitment as in this case; the term appears in the statute itself, which makes it a crime to offer or pay any "commission, bonus, rebate, kickback, or **bribe**" for the referral of patients to a health care facility, such as HWT/RLR. Id. The Government will show that each Defendant knew this conduct was illegal under Florida law, and tried to hide the kickbacks scheme at HWT/RLR from relevant authorities as a result. Knowledge that patient recruitment is illegal in Florida is well-known in the substance abuse treatment industry, as the Government will prove at trial.

The Government will show that individuals at HWT/RLR (SNYDER, LUBOWITZ, and others) paid for the flights of patients from out of state (usually New Jersey) to Florida, which recruiters advertised to get patients to come to HWT/RLR (these activities consist of both travel and use of facilities in interstate commerce). The patient recruiters responsible for referring these patients that traveled, such as LUBOWITZ were also paid a kickback. SNYDER oversaw this system. Once those patients were at HWT/RLR after they traveled, they were given free rent and other benefits, which are further examples of kickbacks. These actions satisfy the Travel Act.[15] While some of the patients' signed promissory notes for their plane tickets, they were never paid back and were not worth the paper they were printed on, and cannot defeat allegations of criminal intent.[16] All of the elements of a Travel Act charge

---

[15] In addition, HWT/RLR (and SNYDER individually) mailed kickback checks from Florida to a patient recruiter in New Jersey (LUBOWITZ) for referring his patients to HWT/RLR, which are the use of the mail, which also satisfies the statute.

[16] The Eleventh Circuit has held that the defendant in a Travel Act case does not have to travel themselves, and does not even have to know or intend that interstate facilities be used in the commission of the offense, but just has to join the conspiracy in some way to facilitate the unlawful activity. United States v. Broadwell, 870 F.2d 594, 608-09 (11th Cir. 1989). The patients are, it can

will be satisfied by this evidence.[17] This is even more readily apparent since Defendants are also charged with aiding and abetting.

Travel Act charges have been brought in the health care context in other federal district courts in New Jersey, and Texas, involving schemes at hospitals involving physician referrals and kickbacks, which are outlawed under state law. In United States v. Beauchamp, Case No. 16-CR-00516-D (N.D. Tex. September 17, 2017), U.S.D.C.J. Fitzwater denied a motion to dismiss Travel Act counts based on the Texas Commercial Bribery Statute. [Order, D.E. 470] [Attached as Ex. 1]. The district court rejected Defendants' arguments that the indictment failed to state an offense, that the Texas Commercial Bribery Statute was preempted under federal law by the federal Anti-Kickback statute, and that the Superseding Indictment failed to allege "use of a facility in interstate commerce."

The Defendants used travel facilities and the mail with the intent to violate Florida's Patient Brokering Act by procuring patients to HWT/RLR through kickbacks and bribes, and flying them from New Jersey and elsewhere to Florida, housing these vulnerable patients—in need of addiction treatment and in danger of overdosing—in a facility that they often could not leave because they had nowhere else to go, as they were not even from Florida. The price of staying was allowing their health insurance plans (or often their parents' plans, as many of

---

be said, unindicted co-conspirators who do the actual traveling, which is sufficient, because interstate travel by a co-conspirator can be attributed to the Defendant who helped cause it, particularly because here the travel was an essential participant in the crime (the patient who is actually getting a free flight, and later on free rent, as a kickback), and the travel itself is an essential part of the offense. See United States v. Peskin, 527 F.2d 71, 75-76 (7th Cir. 1975). And even if this were not true, the purchase of the interstate flights were certainly a use of facilities in interstate commerce to carry on, facilitate, and promote the offense of bribery and kickbacks which violated Florida law.

[17] To sustain a conviction under the Travel Act, the government must prove (1) travel in interstate or foreign commerce, or use of the mail (or any facility) in interstate or foreign commerce; (2) with specific intent to promote, manage, establish, carry on—or distribute the proceeds of—unlawful activity; and (3) knowing and willful commission of an act in furtherance of that intent subsequent to the act of travel. United States v. Logan, 949 F.2d 1370, 1380-81 (5th Cir. 1991)(citations omitted). See also United States v. Corona, 885 F.2d 766, 770-71 (11th Cir. 1989)(discussing intent and knowledge of unlawful activity).

these patients were young), to be billed for unnecessary UAs and therapy. Because bribery is specifically prohibited in the Florida statute outlawing Patient Brokering, the Travel Act charges in the Indictment state the commission of a federal crime. It is that simple. The statute expressly provides for this. Defendants' Motion is flatly wrong. The Travel Act counts are sufficiently detailed to give them notice of what they are accused of, and allows them to prepare their defenses. Their Motion should be denied.[18]

### III. DEFENDANTS' MOTION TO STRIKE PREJDICAL SURPLUSAGE FROM INDICTMENT SHOULD BE DENIED, AND IS PREMATURE.[19]

Under Federal Rule of Criminal Procedure 7(d), a motion to strike alleged surplusage from an indictment is addressed to the sound discretion of the Court. ("Upon the defendant's motion, the court may strike surplusage from the indictment...."). However, a motion to strike surplusage from an Indictment should not be granted "unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial. ... [T]his is a most 'exacting standard.'" United States v. Huppert, 917 F.2d 507, 511 (11th Cir.1990) (quoting 1 Charles A. Wright, Federal Practice and Procedure § 127 at 424–29 (1982)). See also United States v. Awan, 966 F.2d 1415, 1426 (11th Cir. 1992) (same). Therefore, "it is proper to reserve ruling on a motion to strike surplusage until the trial court has heard evidence that will establish the relevance of the allegedly surplus language." Awan, 966 F.2d at 1426.

The key question in deciding a motion to strike surplusage is not the potential prejudice, but rather the relevance of the allegation to the crime charged in the indictment. United States v.

---

[18] And while the Defendants do not make any pre-emption arguments, these would fail because the Government cannot charge the Federal Anti-Kickback statute for payments of kickbacks to patient recruiters and/or patients when the claims were paid by private insurers, not Medicare and Medicaid.

[19] This same argument section appeared in the Government's Consolidated Opposition to Defendants' Motions [D.E. 202}, filed on June 11, 2019. The Government copies it and includes it here for ease of reference since Judge Reinhart is addressing all of the Motions in the Government's original opposition except this one. The Motions in this briefing will be addressed by this Court.

Napolitano, 552 F. Supp. 465, 480 (S.D.N.Y. 1982).[20]  And in this case, the relevance of the language Defendants protest against is plainly relevant, as the Government will show at trial. Defendants are charged with procuring patients through kickbacks, which they knew was illegal under state law (ads the Government will prove). They Government will show they took steps to conceal these facts knowing such conduct was illegal. This makes the state law descriptions relevant. Likewise, the regulations concerning substance abuse treatment guidelines are relevant if the Government can establish that Defendants knew about them but continued their fraudulent conduct anyway. The Government will prove this, emphatically. And a jury instruction that any violation of civil rules and regulations, as listed in the Indictment, is not a crime in and of itself, but is only relevant to show Defendants' intent, can cure any potential prejudice. The use of such an instruction in health care fraud trials in this District is ubiquitous, and has been upheld time after time. See United States v. Ruiz, 698 Fed. Appx. 978, 986 (11th Cir. 2017); United States v. Moran, 778 F.3d 942 (11th Cir. 2015). Defendants' Motion to Strike "prejudicial surplusage" should be denied because the language in the Indictment is nothing of the kind.

---

[20] Allegations in an indictment which are admissible and relevant to the charges may not be stricken regardless of how prejudicial the language. United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990); accord United States v. Hill, 799 F. Supp. 86, 88-89 (D. Kan. 1992) ("[i]f the language is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be")(quoting United States v. Climatemp, Inc., 482 F.Supp. 376, 391 (N.D. Ill. 1979). Indeed, courts have consistently refused to strike language that is "relevant in a general sense to the overall scheme alleged in the indictment" even if it is "not essential to the charges." See, e.g. United States v. Caruso, 948 F. Supp. 382, 392 (D.N.J. 1996)(denying motion to strike references to the defendant's home and to net sum of charitable contributions in indictment charging mail fraud and other statutes in connection with charity fraud scheme); United States v. Giampa, 904 F. Supp. 235, 271-72 (D.N.J. 1995)(citation and quotations omitted). Accordingly, courts have observed that "[t]he scope of a district court's discretion to strike material from an indictment is narrow." United States v. Oakar, 111 F.3d 146, 157 (D.C. Cir. 1997). Indeed, "Rule 7(d) has been strictly construed against striking surplusage." See, e.g. United States v. Rezaq, 134 F.3d 1121, 1134 (D.C. Cir. 1998).

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the Defendants' Motions to Dismiss Counts of the Indictment [D.E. 177], and to Strike Prejudicial Indictment Surplusage, [D.E.180].

Dated June 13, 2019                           Respectfully submitted,

                                                   ROBERT ZINK, ACTING CHIEF
                                                 CRIMINAL DIVISION, FRAUD SECTION
                                                 U.S. DEPARTMENT OF JUSTICE

                                                 ARIANA FAJARDO ORSHAN
                                                 UNITED STATES ATTORNEY
                                                 SOUTHERN DISTRICT OF FLORIDA

                                   By:    */s/ James V. Hayes*
                                                 James V. Hayes (FL Bar # A5501717)
                                                 James.Hayes@usdoj.gov
                                                 Trial Attorney
                                                 United States Department of Justice
                                                 Criminal Division, Fraud Section
                                                 1400 New York Ave., NW
                                                 Washington, DC 20005
                                                 Tel: (202) 774-4276

## **CERTIFICATE OF SERVICE**

I HEARBY CERTIFY that on June 13, 2019, a true and correct copy of the foregoing was filed and served on all counsel via the CM/ECF system.

                                                 */s/ James V. Hayes*
                                                 James V. Hayes